IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| TRINITY HEALTH CORPORATION AND TRINITY HEALTH-MICHIGAN, | Civil Action No. |
| Plaintiffs, | |
| v. | **COMPLAINT FOR DECLARATORY JUDGMENT, PERMANENT INJUNCTION, AND DAMAGES** |
| ANESTHESIA ASSOCIATES OF ANN ARBOR, PLLC AND SIROMED PHYSICIAN SERVICES, INC., | |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Plaintiffs Trinity Health Corporation ("Trinity Health") and Trinity Health-Michigan ("THM") (collectively, "Plaintiffs") bring this action against Defendants Anesthesia Associates of Ann Arbor, PLLC ("A4") and Siromed Physician Services, Inc. ("Siromed") (collectively, "Defendants") based on the following allegations:

## INTRODUCTION

1.     Plaintiffs are bringing this case because Defendants (who are the exclusive anesthesiology providers at six of Plaintiffs' hospitals) are using non-compete clauses to interfere with the ability of their more than 100 anesthesiologists to continue to treat patients at the hospitals they serve.

Defendants are also using these clauses to prevent Plaintiffs from acting to protect themselves against A4's fundamental breaches of its agreements with Plaintiffs.

2.    If not enjoined, Defendants' use of these non-compete clauses will seriously disrupt the provision of anesthesia care at six of Plaintiffs' hospitals. Since anesthesia care is necessary for all surgery, all cardiac procedures, all endoscopies, many deliveries, and a host of other hospital services, these non-competes will broadly interfere with operations at the hospitals, deprive patients of their chosen hospitals and doctors, and harm health care competition and the provision of hospital services in these markets.

3.    The non-competes will have this effect because the anesthesiologists' employer, A4, has terminated its contracts with Blue Cross Blue Shield of Michigan ("BCBSM") and Priority Health ("Priority"), is suing Priority and has stated that it intends to sue BCBSM.  It has also sent notices of termination to Aetna and its affiliate Cofinity (collectively, "Aetna").    These actions fundamentally and materially breach A4 agreements with Plaintiffs, which require that A4 remain in network with these payors, so that THM's patients are fully covered by their health insurance when they obtain services at THM facilities that require anesthesia.

4.    The end of the relationship between A4 and these critical payors will seriously interfere with the ability of patients who obtain insurance from these

2

plans to obtain services fully covered by insurance if they use the THM hospitals at which the A4 anesthesiologists work. Indeed, BCBSM, Michigan's dominant commercial insurer, has now communicated to employers warning that their use of THM hospitals will involve (at least) complications in coverage of anesthesia procedures and the possibility of additional financial liability for patients. As a result, Plaintiffs risk losing large volumes of commercially insured business relating to all their hospital cases insured by Priority or BCBSM that require anesthesia. A4's actions therefore threaten to critically harm the THM hospitals.

5.     In response, Plaintiffs have been forced to provide notice of termination of their contracts with A4, so that they can utilize anesthesiologists who will participate in these critical insurance plans and will allow patients to obtain covered care for anesthesia at Plaintiffs' hospitals.

6.     In order to replace A4 with a full complement of anesthesiologists in a market in which they are very difficult to recruit, Plaintiffs need to employ many of A4's anesthesiologists (which they are expressly permitted to do under their agreement with A4 covering five of the six affected THM hospitals). But Defendants have refused to release these physicians from their non-competes, in violation of the parties' agreement, interfering with Plaintiffs' ability to protect their patients and their hospitals.

31357492.32

7.     By seeking to enforce its non-competes, A4 is effectively seeking to coerce Plaintiffs into giving up the protections the parties have negotiated in their contracts.  If the non-competes are enforceable, A4 hopes that Plaintiffs will decide that they cannot afford to terminate their contracts with A4 because they do not have adequate replacement anesthesiologists available, even though A4 has blatantly violated the payor participation requirements in its contracts.

8.     Thus, Defendants seek to use the non-competes to render A4's contractual obligations meaningless.  If the non-competes are not enjoined, A4 will be able to violate its contracts with Plaintiffs with impunity and potentially threaten the insurance coverage of thousands of THM patients, secure in the belief that its non-competes will allow it to remain under contract whether it observes its obligations or not.  Defendants seek to impose an impossible dilemma on Plaintiffs – either accept A4's breaches of contract and risk losing substantial patients whose insurance coverage has been disrupted, or terminate A4 without adequate replacement anesthesiologists available, and thereby face equal or greater losses due to interference with surgeries and other critical cases.  For this reason, among many others, the non-competes are illegal and unreasonable as applied to Plaintiffs under these circumstances.

9.     Overall competition in a number of markets is impacted by these actions, because this is very far from a typical case involving non-compete

4

restrictions.   The issues here involve approximately 100 physicians who exclusively provide anesthesiology services at six THM hospitals.   Moreover, revenues from the affected services at THM hospitals involve at least 20 times the revenues from A4's anesthesia services at those hospitals.   Therefore, the effects of the non-competes reach far beyond anesthesia services.

10.   Defendants' actions not only violate federal antitrust laws, but are also unreasonable under Michigan law and breach A4's contracts with Plaintiffs in multiple respects.   In particular, A4's failure to participate in contracts with Priority and BCBSM is a breach of the parties' agreements, and A4 is liable to THM for all financial losses due to declines in hospital patients as a result of A4's actions.   Since A4's termination of the BCBSM contract occurred less than a week ago, Plaintiffs are unable to estimate those damages at this time.   But they could amount to millions of dollars per month.   Defendants' refusal to release A4's physicians from their non-competes is also a violation of the parties' agreement.

11.   Plaintiffs are therefore seeking relief against these actions, as well as damages based on Defendants' violations of the antitrust laws and breaches of contract.

## THE PARTIES

12.   Plaintiff Trinity Health is a faith-based, nonprofit, tax exempt corporation organized under and by virtue of the laws of Indiana and is

5

headquartered in Livonia, Michigan.  Trinity Health is the parent corporation of THM.

13.    Plaintiff THM is a Michigan nonprofit corporation and a subsidiary of Trinity Health.  THM owns and operates, among other facilities in Michigan, the five THM hospitals in its Saint Joseph Mercy Health System ("SJMHS") division, located in Ann Arbor, Chelsea, Howell, Livonia, and Pontiac; and Mercy Health Saint Mary's in Grand Rapids (part of the Mercy Health division of THM).

14.    The five SJMHS hospitals are described more fully below:

a.    Saint Joseph Mercy Ann Arbor is a 537-licensed bed academic teaching hospital in Ann Arbor, Michigan, offering a variety of inpatient and outpatient services, including cardiology, obstetrics, orthopedics, surgery, and Level II trauma care.

b.    Saint Joseph Mercy Chelsea is 133-licensed bed hospital and part of a joint venture between SJMHS and University of Michigan Health.  Located in Chelsea, Michigan, it offers a variety of inpatient and outpatient services, including cardiology, orthopedics, surgery, and women's services.

c.    Saint Joseph Mercy Livingston is a 136-licensed bed hospital in Howell, Michigan.    It offers a variety of inpatient and

6

outpatient services, including cardiology, orthopedics, and surgery.

d.   Saint Mary Mercy Livonia is a 304-licensed bed hospital in Livonia, Michigan.   It offers a variety of inpatient and outpatient services, including cardiology, obstetrics, and surgery.

e.   Saint Joseph Mercy Oakland is a 443-licensed-bed hospital in Pontiac, Michigan, offering a variety of inpatient and outpatient services, including cardiology, orthopedics, surgery, Level II trauma care, and women's services.

15.   Mercy Health is another division of THM, and includes, among other facilities, Mercy Health Saint Mary's ("MHSM"), a 344-licensed bed hospital in Grand Rapids, Michigan.   MHSM offers a variety of inpatient and outpatient services, including cardiology, neurology orthopedics, surgery, obstetrics, and critical care services.

16.   The THM hospitals have won numerous awards for their strong commitment to patient quality, safety, and satisfaction.   Saint Joseph Mercy Oakland has received numerous recognitions from Healthgrades, and been named a Blue Cross Blue Shield "Blue Distinction Center" for Knee and Hip Replacements, and Spine Surgery, and designated by the Aetna Institute of Quality for Total Joint

7

Replacement and Spine Surgery.  It is also a Leapfrog "Top Hospital" for patient quality and safety, scoring an "A" safety rating in 2019.  Saint Joseph Mercy Oakland was also named among the top five percent of U.S. hospitals in women's health excellence by an independent health care ratings organization.

17.    Saint Joseph Mercy Oakland also has a unique structural heart program, involving a multi-disciplinary team of cardiovascular and cardiac surgery specialists, who perform, among other things, cardiac surgery and cardiac procedures, all of which require anesthesia.  Saint Joseph Mercy Oakland was named one of the nation's top 50 cardiovascular hospitals by Thomson Reuters for eight consecutive years.   The hospital has also been identified as a "Blue Distinction Center" for cardiac care and maternity care by Blue Cross.

18.    Saint Joseph Mercy Oakland was named a "Top Teaching Hospital" by The Leapfrog Group and the Economic Alliance for Michigan.  It also received an "Excellence Award" in patient safety from the Economic Alliance for Michigan.

19.    Saint Joseph Mercy Ann Arbor has been named a "Distinguished Hospital for Clinical Excellence" by Healthgrades and received the "Governor's Award of Excellence" from MPRO.  It also received an "Outstanding Patient Experience" award from Healthgrades, and was named a "Top 100 Hospital" by IBM Watson Health/Truven Health Analytics.  Saint Joseph Mercy Ann Arbor is a

8

"Blue Distinction Center" for Cardiac Care and a "Blue Distinction Center+" for Spine Surgery, Knee and Hip Replacement, and Maternity Care.

20.     Saint Joseph Mercy Chelsea received an "Outstanding Patient Experience" award from Healthgrades and was named a "Top General Hospital" by The Leapfrog Group.  It also received an "Excellence Award" in patient safety from the Economic Alliance for Michigan.

21.     Saint Joseph Mercy Livingston won the "Hospital Patient Safety Award" from the Economic Alliance for Michigan and was named a "Top 100 Hospital" by IBM Watson Health/Truven Health Analytics.  It also is a "Blue Distinction Center" for Knee and Hip Replacement.

22.     Saint Mary Mercy Livonia was named a "Most Wired" hospital by the Hospitals & Health Networks' Most Wired Survey.  It also is a "Blue Distinction Center" for Cancer Care and a "Blue Distinction Center+" for Knee and Hip Replacement and Maternity Care.

23.     Mercy Health Saint Mary's received an "Outstanding Patient Experience" award from Healthgrades.  It was named a "Top 100 Hospital" by IBM Watson Health/Truven Health Analytics.  Mercy Health Saint Mary's also was a recipient of the Maternity Care Excellence Award from the Economic Alliance for Michigan.  It is a "Blue Distinction Center+" for Spine Surgery, Knee

and Hip Replacement, and Maternity Care.  Mercy Health Saint Mary's has repeatedly been awarded the "Governor's Award of Excellence" from MPRO.

24.    Defendant Anesthesia Associates of Ann Arbor is a professional limited liability corporation based in Ann Arbor, Michigan.  A4 employs more than 100 anesthesiologists who provide services at many locations in Michigan, including the exclusive provision of anesthesiologists' services at THM's hospitals in Ann Arbor, Chelsea, Howell, Livonia, Pontiac, and Grand Rapids.  A4 anesthesiologists also serve as faculty for the Wayne State School of Medicine's anesthesia medical residency program hosted by Saint Joseph Mercy Oakland in Pontiac.

25.    Defendant Siromed is a Delaware corporation with its principal place of business in Waltham, Massachusetts.  It provides management services and capital to hospitals, ambulatory surgery centers, and other health care facilities.  According to its website, "Siromed's anesthesia platform is anchored by [A4], which is the largest provider of anesthesia and pain management in the state of Michigan," and another medical group located in Florida.  In March of 2018, Siromed became the parent of A4.  Siromed is directly involved in managing the A4 operations in Michigan, and was directly responsible for the actions giving rise to this Complaint.  Siromed is a portfolio company of private equity firm Prospect Hill Growth Partners, L.P.

10

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1367; Sections 4 and 16 of the Clayton Act, U.S.C. §§ 16 and 26; and Section 1 of the Sherman Act, 15 U.S.C. § 1.  This Court has exclusive jurisdiction over the claims in this case brought pursuant to the Sherman Act and Clayton Act.

27.     Both Defendants transact business in this district and are subject to personal jurisdiction therein.  A4 has maintained its principal place of business in this district and resides in this district.  The actions complained of herein and giving rise to this Complaint took place in this district.  Plaintiffs also have maintained their principal place of business in this district, and have suffered the bulk of their damages in this district.  Five of the six affected THM hospitals are located in this district.  Venue is proper in this district pursuant to 15 U.S.C. §§ 15, 22, and 26 and 28 U.S.C. § 1391.

## TRADE AND COMMERCE

28.     Defendants are engaged in interstate commerce and their activities substantially affect interstate commerce.  Millions of dollars of A4's revenues come from sources located outside of Michigan, including payments from out-of-state commercial payors, including Aetna.  A4 treats a significant number of patients from other states, including many surgical cases at Plaintiffs' hospitals

11

involving out-of-state patients.  In addition to A4, Siromed provides management services and capital to other health care providers outside of Michigan.

29.    Plaintiffs receive millions of dollars of revenue from sources located outside of Michigan, including payments from out-of-state commercial payors, including Aetna.  Plaintiffs' Michigan hospitals affected by A4's conduct receive millions of dollars in revenues for the treatment of commercially-insured patients from out of state who receive services requiring anesthesia.  Trinity Health also borrows hundreds of millions of dollars from lenders in interstate commerce through its bond offerings, which are used to benefit, among others, the hospitals and services at issue in this case.

30.    Plaintiffs and Defendants also spend millions of dollars on the purchase of supplies in interstate commerce, including, most relevant to this case, surgical supplies and instruments, drugs used for anesthesia, and anesthesia machines and other equipment.

31.    Defendants' actions will result in a substantial reduction in competition in the relevant antitrust markets described below, which will affect payments made in interstate commerce by commercial payors serving those markets, as well as payments made by the parties in interstate commerce.

## FACTUAL ALLEGATIONS

### The Role of Anesthesiologists

12

32.     An anesthesiologist is a physician who specializes in the care of patients before, during, and after surgery and other procedures requiring anesthesia or pain management.    Anesthesiologists also meet with patients and their physicians before surgery or other procedures involving anesthesia to evaluate patients' health and to ensure that patients' anesthesia care is safe and effective.

33.     Anesthesiologists administer anesthesia so patients do not feel pain when they are undergoing surgeries, cardiac procedures, deliveries, and other procedures.    They also perform other functions, including monitoring and maintaining patients' normal vital signs (e.g., respirations, pulse, blood pressure, body temperature); identifying and treating any related emergencies that may occur before, during, or after the procedures (e.g., allergic reactions to medication, bleeding, changes in vital signs); and controlling pain and providing other care post-procedures.

34.     Anesthesiologists play critical roles in every hospital, since anesthesia is required for all, or virtually all, surgeries and cardiac procedures, and for deliveries of newborns involving epidurals and cesarean sections ("C-sections"), among other procedures.    Surgeries, cardiac procedures, and obstetrical deliveries are major components of the services provided by virtually every hospital.

35.     An anesthesiologist may work with a certified registered nurse anesthetist ("CRNA").    A CRNA is an advanced practice nurse who administers

13

anesthesia under some circumstances. CRNAs are required by law to be supervised by anesthesiologists and can only provide a fraction of the anesthesia care provided by anesthesiologists. CRNAs are therefore not substitutes for anesthesiologists in any health plan's network. A4 employs the CRNAs at Saint Joseph Mercy Oakland, but Plaintiffs employ the CRNAs who work at the other five hospitals utilizing A4 anesthesiologists.

36.     Typically, hospitals obtain the services of anesthesiologists either by employing them or contracting with a group which employs a significant number of anesthesiologists. In order to be able to efficiently schedule anesthesia services for the wide range of surgeries and other procedures performed in hospitals, and in order to obtain the services of anesthesiologists to address administrative and quality issues related to those procedures, it is more efficient for hospitals not employing anesthesiologists to deal with a single group in an exclusive relationship. These anesthesiologists may also serve in other roles at the hospital, including in leadership and on the medical faculty.

**<u>Health Care Provider Reimbursement and Competition</u>**

37.     Hospitals and other health care providers obtain their revenues through government programs (such as Medicare and Medicaid) and through payments by commercial payors who provide insurance to their members. Virtually no hospital services are paid for by uninsured individuals.

14

38.     Payments by commercial payors are very important to the success of any hospital, given the lower level of payments made by Medicare and Medicaid.

39.     Competition among health care providers occurs in two stages.  In the first stage, providers compete to be selected as in-network providers by commercial managed care plans (also referred to herein as "commercial payors"). Employers typically select commercial managed care plans on behalf of their employees.  Commercial payors seek to offer convenient networks of providers, including, most importantly, hospitals and physicians, for their members. Employees and subscribers prefer to have a choice from a variety of providers in convenient locations near where they reside.   Managed care plans negotiate contracts with hospitals and physicians to create provider networks which provide these choices.

40.     Employees and subscribers pay higher out-of-pocket costs when they see a non-contracted or out-of-network provider.  Patients who are insured through a managed care plan therefore have an incentive to choose in-network providers in order to minimize or avoid out-of-pocket expenses, and providers have incentives to participate in managed care plans' networks because that increases their access to patients insured through those organizations.

41.     In the second stage of competition, health care providers compete with other in-network providers to attract patients.  Managed care plans typically

15

offer multiple in-network providers with similar out-of-pocket costs, and those providers compete primarily on non-price dimensions in this second stage to attract patients by offering better services, amenities, convenience, quality of care, and patient satisfaction than their competitors offer. Price competition occurs primarily at the first step of competition, in negotiations between payors and providers.

42.     In Michigan, the predominant commercial payor is BCBSM, which covers 4.5 million individuals in Michigan. BCBSM represents the substantial majority of commercially insured surgical cases, cardiac procedures, obstetrical deliveries, and other procedures requiring anesthesia at the THM hospitals.

43.     Priority and Aetna are also very important commercial payors in Michigan and for Plaintiffs. Priority is the second-largest commercial payor in Michigan, and provides commercial insurance coverage for a substantial share of surgical cases, cardiac procedures, obstetrical deliveries, and other procedures requiring anesthesia at the THM hospitals. Aetna (and its affiliate Cofinity) also provides commercial insurance coverage for a substantial share of surgical cases, cardiac procedures, obstetrical deliveries, and other procedures requiring anesthesia at the THM hospitals.

44.     No hospital could afford to be out of network with BCBSM, and it would suffer significant financial losses if it were out of network with Priority or Aetna.

16

45.     For these reasons, hospitals, including the THM hospitals, routinely include in their contracts with anesthesiologist groups a requirement that the group participate in network with all (or all significant) payors with which the hospital participates.   If the anesthesiologists did not participate in network with, for example, BCBSM, then patients would not necessarily be covered for the payment of all anesthesia services in connection with their surgeries or other procedures at a THM hospital.   As a result, it is highly likely that such patients would choose to have their surgeries or other procedures requiring anesthesia performed at other hospitals where the anesthesiologist is an in-network provider.   And it is highly likely that physicians would accede to their patients' choice, or proactively avoid imposing financial burdens on their patients by providing them with care at other facilities.   For these reasons, participation in all the hospitals' commercial payor networks by anesthesiologists is critical to the hospitals' ability to perform surgeries, cardiac procedures, and obstetrical deliveries, among other procedures, and be paid for them.

46.     In seeking anesthesiologists' services, hospitals often consider a number of local and national groups.   However, all of these groups depend significantly on the supply of anesthesiologists in the local area in which the hospital is situated.   It is difficult and time-consuming to recruit anesthesiologists to a new location, and such recruitment into Michigan has been extremely difficult.

There is a significant shortage of anesthesiologists nationally, and that shortage is expected to grow.  For example, a study from RAND Health found there are shortages of anesthesiologists nationwide and shortages of both anesthesiologists and CRNAs in Michigan.  *See* Daugherty, Lindsay, Raquel Fonseca Benito, Krishna B. Kumar, and Pierre-Carl Michaud, *Is There a Shortage of Anesthesia Providers in the United States?*, RAND Corporation, 2010, https://www.rand.org/pubs/research_briefs/RB9541.html.  For this reason, it is very difficult to replace an anesthesiology group.

47.    This difficulty in recruiting has affected A4, which is short staffed at the THM hospitals.  A4's anesthesiologists must often work longer hours and come in from vacation to meet the demand for anesthesia services at the THM facilities.  Despite this, there are occasionally gaps in anesthesia coverage at the THM facilities, which may delay patient services.  For example, at Saint Joseph Mercy Oakland certain cases have been turned away, some of which were then performed at Beaumont Health.

48.    A4 also provides the THM hospitals with anesthesiologists with subspecialty skills, which are in even more limited supply in Michigan and across the United States.  For example, cardiac anesthesiologists have additional board certifications in transesophageal echocardiography.

**Plaintiffs' Agreements with A4**

18

49.    A4 entered into agreements with Plaintiffs to provide anesthesia services at Mercy Health Saint Mary's in Grand Rapids in 2016, at all of the SJMHS hospitals (except Saint Joseph Mercy Oakland) in 2018, and at Saint Joseph Mercy Oakland later in 2018.  The agreement to provide anesthesiologist services at Mercy Health Saint Mary's in Grand Rapids was entered into under an Anesthesia Services Agreement ("ASA") in September 2016.  The agreements to provide services at the other hospitals were undertaken pursuant to a Master Services Agreement ("MSA") entered into in December 2016, and an Order entered into pursuant to the MSA with regard to all of the foregoing SJMHS hospitals (except Saint Joseph Mercy Oakland) in January 2018 ("Order"), and at Saint Joseph Mercy Oakland in August 2018 ("First Amendment to Order").

50.    Section 8.12 of the ASA and Section X.E. of the MSA both require A4 to participate in network with payors contracting with the THM hospitals. Specifically, Section X.E. of the MSA states: "Group and each Provider shall be a participating provider in the Federal health care programs, as defined at 42 U.S.C. § 1320(a)-7b(f), which programs include, but are not limited to, Medicare and Medicaid, *and participate in third-party payor programs with which Hospital participates during the term of all applicable Orders.*"  (Emphasis added).  Section 8.12 of the ASA states: "With respect to the professional services subject to this Agreement, the Group and its Members shall participate on an assignment basis in

Medicare, Medicaid, the insurance plans by which MHSM's employees are covered (which may be changed at the sole discretion of MHSM [the division of THM including five affected Trinity hospitals] during the term of this Agreement), *and any third-party payer program in which MHSM participates and which represents at least five percent (5%) of the Facilities' aggregate surgical business based on gross charges.*"   (Emphasis added).   Each of BCBSM, Priority, and Aetna satisfy the 5% threshold.

### A4's Actions Taken against Commercial Payors and the Payors' Responses

51.     A4 has terminated its contracts with Priority (effective on April 20, 2019) and BCBSM (effective July 16, 2019), and provided notice of termination to Aetna, because A4 wants substantially higher rates from these payors.  A4 sued Priority for breach of contract in the Circuit Court for the County of Washtenaw, Michigan on June 14, 2019.   According to A4's complaint, Priority owes substantial additional funds to A4 for each case handled since termination.  Priority has paid A4 at the rate agreed to by A4 and Priority under their prior agreements, but A4 contends that, in the absence of an agreement, Priority is obligated to pay at much higher rates.  A4's claims against Priority equal $1.2 million over 8 weeks, or $150,000 per week.

52.     Priority states that it has elected, for the present, to provide coverage for patients with anesthesia services provided by A4 at the previously contracted-

for rates.  However, at least some patients have represented to THM personnel that they have been told by Priority that A4's services are no longer covered. Moreover, Priority has communicated to patients that A4 is no longer a participating provider.  It has also informed its members that it cannot guarantee that they will not receive a bill from A4.  Since the cost of anesthesia services can amount to hundreds or even thousands of dollars, many patients who receive such notice will want to have those services performed by a group other than A4.  Given the exclusive contract between A4 and the six THM hospitals, that means that these patients will need to have these services provided at a location other than a THM facility.  A4's actions therefore threaten to encourage Priority members to choose non-THM hospitals and doctors because of the possible uncertainty regarding insurance coverage.  Plaintiffs are already receiving some questions and concerns from Priority members about possible out-of-network costs if they have their surgeries performed at THM.

53.     A4's lawsuit against Priority threatens to cause Priority to take even more aggressive actions.  A4 has taken the position that it is entitled to collect from Priority substantially more than Priority paid A4 under their prior agreement while there is no contract in place between the parties.  To avoid this exposure, Priority has a substantial incentive to discourage its patients from utilizing A4's services, since A4's claims in its lawsuit will cover every case covered by Priority which is

21

treated by A4 from the time of the termination forward.  There is therefore a very significant risk that Priority will change its temporary practice, refuse to reimburse patients for services provided by A4 (which it has every right to do since these services are no longer in network), and thereby encourage patients to have their anesthesia services, and, inevitably, their hospital services, provided elsewhere.

54.    A4 also has informed Plaintiffs and BCBSM that it planned to sue BCBSM as it had Priority.  A4's contract with BCBSM terminated, at A4's insistence, on July 16, 2019.  A4 was unable to reach agreement with BCBSM regarding payments going forward, because BCBSM demanded that A4 promise not to sue BCBSM for additional reimbursement, and A4 refused to agree to forego such litigation.

55.    BCBSM has now informed employers that it will be the members' responsibility to pay A4 for anesthesia care in connection with services at THM hospitals, though BCBSM will provide reimbursement for that care.  This will put the members in the middle of the BCBSM-A4 dispute.  There is a significant risk that members who do not wish to have the responsibility of paying directly for their anesthesia care will instead choose to utilize other hospitals and doctors that do not depend upon A4.

56.    BCBSM has also informed employers that it cannot guarantee that the members will not face claims by A4 for "balance billing," i.e., claims for

22

additional payments by the member beyond the amounts the member is reimbursed by BCBSM.  This would be consistent with A4's position in its lawsuit against Priority, that it is entitled to substantially greater payment than the contracted for rate Priority had paid A4 under their now terminated contract.  Significantly, A4 has not been willing to commit to BCBSM that it would not "balance bill" members, except as part of a temporary "standstill" arrangement which was rejected by BCBSM.  The prospect of this kind of "surprise billing" of patients – a highly discussed problem in health care – is likely to deter many patients and employers from using the THM facilities.

57.    In fact, THM executives have already heard from one large employer that it was seriously considering telling its employees that they should not use THM facilities for services requiring anesthesia.  Many employers are undoubtedly now making the same decisions.

## The Likely Effects of A4's Actions and Plaintiffs' Response

58.    These actions threaten to have a devastating impact on Plaintiffs' hospitals.  A loss of even 20% of the relevant surgery cases would cause damages of more than $30 million annually, or several million dollars per month.  The lost cases will extend well beyond surgery to include loss of related ancillary services (such as x-rays and laboratory services) and other cases (including endoscopies, cardiac procedures and many births) requiring anesthesia.  Moreover, Plaintiffs'

hospitals will be responsible under the contracts they have with payors in which they assume the total cost of care for cases involving attributed lives which may need to be treated at other, more expensive facilities if they are diverted from the THM hospitals.

59.     These shifts of patients from the THM hospitals would not only create short-term revenue losses, but would have a long term impact on the hospitals' success.  Physician groups would have an incentive to shift more of their cases to other hospitals, and many likely would not return to the THM hospitals even after the immediate crisis ended.  Most young families' first use of the hospital is in connection with the births of their children, and that often establishes a relationship with a hospital that persists through the lives of the family members.  Therefore, the loss of deliveries is likely to have a significant long term effect on these individuals' use of the hospitals.  For these reasons, A4's actions would likely have long-term impacts on the hospitals' reputation, goodwill, and market positions.

60.     A4's actions thus threaten catastrophic consequences for the THM facilities which have contracted with A4.  The use of THM hospitals for these services is likely to be substantially reduced as a result of A4's actions, in particular, with regard to the patients who are financially most critical to the THM hospitals because of the higher payment rates for commercial reimbursement.

24

61.     A4 shared its plans regarding departicipation and litigation with THM executives beginning in February, 2019.  Plaintiffs' executives have repeatedly urged A4 to forego these tactics because of the very serious consequences to the THM hospitals, patients, physicians whose procedures require anesthesia and to A4 itself.  A4's leadership consistently rejected these admonitions.

62.     Because of the great threat that these actions posed to Plaintiffs' hospitals and their physicians, and because non-participation in payor contracts is a critical breach of the ASA and MSA, Plaintiffs provided their notice of concerns to A4 regarding these breaches of the parties' contracts.  Plaintiffs met with A4 on July 1, 2019, in an attempt to resolve their differences.  Plaintiffs also held an additional meeting on July 11, 2019, as required under the ASA.  A4's executives promised that they could proceed with the payors in a manner that would result in a quick resolution of Plaintiffs' concerns without any disruption to patients or the hospitals.  As described above, this has proved to be untrue.

63.     Plaintiffs were therefore forced to provide A4 with a notice of termination of the ASA, effective September 2, 2019.  Additionally, the ASA expires on September 1, and Plaintiffs now do not intend to renew the agreement.  Plaintiffs will also send notice of termination of the Order applicable to the other SJMHS hospitals identified herein, also effective on September 2, 2019.

64.    Plaintiffs took those actions only after giving A4 repeated opportunities to resolve the disputes with the commercial payors.  Plaintiffs delayed the notice of termination by more than a week after the unsuccessful July 11 meeting in order to give A4 one more chance to resolve its disputes.  A4 refused to do so.

65.    The only realistic alternative for Plaintiffs at this juncture is to employ the A4 anesthesiologists directly after termination.  It is important for the surgeons and other physicians practicing at the THM hospitals to have strong working relationships with, and trust in, the anesthesiologists.  This is particularly critical for complex surgical cases where physicians and anesthesiologists often work side-by-side for many hours in very close quarters.  A4's anesthesiologists also play an important role in terms of scheduling and continuity in the provision of services at the THM hospitals.  While Plaintiffs have begun to recruit "locum tenens," or temporary, anesthesiologists to fill these roles, this is not a satisfactory long-term solution for the THM hospitals, and the nationwide shortage of anesthesiologists makes the retention of even locum tenens anesthesiologists quite difficult.  Given this nationwide shortage and the difficulty in recruiting anesthesiologists, the only viable solution is employment of the A4 physicians.

66.    Plaintiffs have therefore offered employment to all the A4 anesthesiologists, effective on termination.  However, Defendants' non-compete

26

agreements with A4's anesthesiologists threaten to interfere with these efforts. These non-compete agreements purport to forbid the anesthesiologists, after the end of their employment with A4, from practicing for one year at any location within 10 miles of the location in which they currently have practiced, and for five years at a site previously managed by A4.

67.     Recognizing this potential problem, the MSA states at Section XII.I. that A4 and its affiliates will "release each Provider from any restrictive covenant with the Group without penalty permitting Provider to be hired by or otherwise continue to provide services at the Hospital, to Trinity Health or another Trinity Health Hospital; provided that a mutually acceptable fee for such release based on the investment by Group in recruiting and training the Provider may be specified in the Order."  No such payment is specified in the Order.  Additionally, Section XIII of the MSA specifically permits Trinity Health to employ members of A4.  Section XIII.A. of the MSA specifically states that "Group agrees that in the event of termination of this Agreement, Hospital has the right to hire any or all of the Providers."   Therefore, the MSA requires that Defendants release their anesthesiologists from their non-competes if they wish to become employed by Plaintiffs after termination of A4's agreements.

68.     In the notice of termination, Plaintiffs asked A4 to release its anesthesiologists from the non-competes pursuant to the ASA, but A4 has not

agreed to do so.  If this action stands, and if it deters the A4 anesthesiologists from accepting Plaintiffs' offers of employment, it would force Plaintiffs into an untenable dilemma.  Due to A4's departicipation with, and lawsuits or threatened lawsuits against, Priority and BCBSM, as well as (potentially) Aetna/Cofinity, Plaintiffs must either accept the loss of large numbers of patients critical to the THM hospitals' operations, or seek alternative anesthesia care from temporary "locum tenens" physicians.  Retaining "locum tenens" physicians is an inadequate short-term solution to a significant, long-term problem for the THM hospitals. Additionally, because the A4 anesthesiologists serve as faculty for the Wayne State School of Medicine's anesthesia residency program hosted by Saint Joseph Mercy Oakland, any disruption as a result of Defendants' actions would also jeopardize the anesthesia residency program.

69.    In Plaintiffs' experience, these kinds of disruptions are both significant and long-lasting.  In Grand Rapids, where A4 was brought in to replace another anesthesia group in 2016, A4 was only able to employ some of the existing anesthesiologists at Mercy Health Saint Mary's.  The gap in anesthesia coverage has yet to be filled completely by A4 after almost three years.  As a result, Mercy Health Saint Mary's lost more than 10% of its surgery and delivery cases and cardiac procedures compared to the number of cases before the changeover in anesthesiologists.  Moreover, prior to the changeover, the number of cases in the

categories was rapidly increasing.  As compared to what would have occurred had this trend continued, Mercy Health Saint Mary's has lost almost 20% of these cases.  This reduction in volume still exists today, three years later.

70.     The THM hospitals would likely face even greater losses of cases here if physician compliance with the non-compete clauses results in the need for Plaintiffs to face the nearly impossible task of recruiting an entirely new cadre of anesthesiologists at the THM hospitals.

71.     Plaintiffs have therefore informed the A4 physicians in their offers of employment that THM will indemnify the A4 physicians against any losses relating to claims that they have violated their non-competes, and that Plaintiffs will challenge the non-competes in court.  Plaintiffs believe that this litigation is critical to their ability to employ these badly needed anesthesiologists.

72.     For these reasons, Defendants' actions threaten to substantially reduce output in the provision of their anesthesiology services.  This is especially significant because A4 has market power by virtue of the shortage of substitute anesthesiologists available to serve the THM facilities.

### Irreparable Injury As A Result Of Defendants' Actions

73.     Plaintiffs will be irreparably harmed by Defendants' actions. Defendants' actions are causing, and will continue to cause, substantial patient confusion and harm to Plaintiffs' goodwill with its patients, as well as very serious

29

disruption of Plaintiffs' relationships with its surgeons and other physicians (who may refer patients for surgery or other services requiring anesthesia).  Defendants' actions are also very likely to cause irreparable injury because of the long-term effect of the loss of patients and physician relationships.  Moreover, with the departure of key faculty if A4's non-competes are enforced, Defendants' actions threaten to jeopardize the Wayne State School of Medicine anesthesia residency program at Saint Joseph Mercy Oakland.

### Relevant Antitrust Service Markets

74.    One relevant service market in this case is the market for inpatient surgical services sold to commercially-insured patients ("inpatient surgical services").  This market encompasses a broad cluster of inpatient surgical services, including orthopedics, general surgery, cardiac and vascular surgery, gynecological surgery, urological surgery, spinal surgery, and neurosurgery.  An inpatient stay is one that requires an overnight stay.  These services are offered to patients by the same set of hospital competitors and under similar competitive conditions.  All commercial health insurance products cover inpatient surgical services.  Alternatively, each of these surgery service lines could be viewed as separate product markets.  In that event, the competition analysis described herein would be the same.

31357492.32

75.    A second relevant service market in this case is the market for outpatient surgical services provided at hospital-based facilities and sold to commercially-insured patients ("outpatient surgical services").    This market encompasses a broad cluster of outpatient surgical services including orthopedics, general surgery, cardiac and vascular surgery, gynecological surgery, urological surgery, spinal surgery, and neurosurgery.   Outpatient services do not require an overnight stay.   These services are offered to patients by the same set of hospital-based competitors and under similar competitive conditions.    All commercial health insurance products cover outpatient surgical services.   Alternatively, each of these surgery service lines could be viewed as separate product markets.   In that event, the competition analysis described herein would be the same.

76.    A third relevant service market in this case is the market for cardiac procedures sold to commercially-insured patients.   This market encompasses a cluster of cardiac procedures performed in the cardiac catheterization lab at a hospital, including diagnostic procedures (e.g., diagnostic cardiac catheterization and biopsy), interventional procedures (e.g., balloon angioplasty, percutaneous coronary intervention), and electrophysiology procedures.   These procedures are among the most significant procedures for the THM hospitals, like all hospitals, in terms of their contribution to the hospitals' bottom line and ability to perform their

mission.   These services are offered to patients by the same set of hospital competitors and under similar competitive conditions.

77.   A fourth relevant service market in this case is the market for obstetrical delivery services sold to commercially-insured patients.  This market encompasses a cluster of services related to birth of a baby.  These services are offered to patients by the same set of hospital competitors under similar competitive conditions.

78.   These relevant service markets do not include inpatient or outpatient surgical services, cardiac procedures, or obstetrical delivery services reimbursed by the government under the Medicare or Medicaid programs.  A provider offering the relevant services could not increase its volume or revenue by persuading patients to sign up for Medicare or Medicaid, because enrollment in these programs is limited to the elderly, disabled, or underprivileged.  Medicare and Medicaid typically pay significantly lower rates than do commercial insurers, and, therefore, are not an alternative for providers.

## Relevant Antitrust Geographic Markets

79.   The relevant service markets described above are local.  Because patients typically seek medical and hospital care close to home, they strongly prefer health insurance plans that provide access to networks of hospitals and physicians close to home as well.  Additionally, patients desire local hospitals that

32

are in-network in their plan without financial penalties.  Employers offering health insurance to their employees therefore demand insurance products that provide access to health care provider networks in all the areas in which substantial numbers of their employees live.  Individuals purchasing individual health insurance likewise demand insurance products that provide access to health care provider networks, including hospitals, in the areas in which they live.

80.    Kent County is a relevant geographic market in this case with respect to each relevant service market.  Kent County includes the city of Grand Rapids and surrounding areas.  Individuals living in Kent County and their employers seek local health care, including local hospitals, and demand that the leading hospitals in Kent County be included in their health insurance coverage as in-network providers.  A health insurer could not successfully sell health insurance products to employers with significant numbers of Kent County employees without including a choice of Kent County providers, including leading Kent County hospitals, in its network.

81.    There are no significant hospitals outside of Kent County which are unaffiliated with the Kent County hospitals closer to metropolitan Grand Rapids (where most Kent County residents live) than a one hour drive.  Grand Rapids area residents would not be willing to utilize a health plan which included in its network only significant hospitals at a one hour drive away from Grand Rapids.

82.     Therefore, hospitals outside of Kent County are not reasonable substitutes for those within the county for inpatient and outpatient surgical services, cardiac procedures, and obstetrical delivery services.  It is very important to patients that these services are conveniently located and readily accessible.

83.     Oakland County is another relevant geographic market in this case with respect to each relevant service market.   Although it is part of the metropolitan Detroit area, individuals living in Oakland County and their employers seek local health care, including local hospitals, and demand that the leading hospitals in Oakland County be included in their health insurance coverage as in-network providers.   A health insurer could not successfully sell health insurance products to employers with significant numbers of Oakland County employees without including a choice of Oakland County providers, including leading Oakland County hospitals, in its network.  Therefore, hospitals outside of Oakland County are not reasonable substitutes for those within the county for inpatient and outpatient surgical services, cardiac procedures, and obstetrical delivery services.   It is very important to patients that these services are conveniently located and readily accessible.

## Anticompetitive Effects

84.     The non-compete clauses would have the anticompetitive effect of diverting significant business from the THM hospitals, and causing more surgeries,

34

cardiac procedures, and obstetrical deliveries to be performed at the hospital systems in the relevant markets with the largest market shares, as described below. The actions described above would therefore significantly diminish competition from the THM hospitals, and substantially increase already high market concentration in the relevant markets. They would thereby harm overall competition in the relevant markets, adversely affecting price and quality.

85.     Under the Herfindahl-Hirschman Index ("HHI") test, a measure of market concentration set forth by the federal antitrust agencies in their Horizontal Merger Guidelines, competition is assessed by summing the squares of the market shares of the competitors. By that measure, the relevant markets are each "highly concentrated," defined by the federal antitrust agencies as markets with HHIs over 2,500. When markets are highly concentrated, even small shifts of patients from hospitals with smaller shares to hospitals with greater market shares can be anticompetitive.

86.     Defendants' use of the non-compete provisions in their agreements with A4's anesthesiologists would further increase these already high levels of concentration in each of the relevant service markets by significantly reducing the role of Plaintiffs' hospitals in Kent and Oakland counties as viable options for physicians and their patients, and diverting substantial volumes of the relevant

services to the hospital systems with the largest market shares in each respective county.

87.    The use of the non-competes would also deprive patients of their chosen high quality hospitals, and limit competition from the THM hospitals in each of the relevant markets.

## Anticompetitive Effects in Kent County

88.    Currently, many surgeons and other physicians practicing at Mercy Health Saint Mary's also perform procedures at the other hospitals and associated outpatient centers in Kent County, in particular, the dominant hospital system in Kent County, Spectrum Health.  When Mercy Health Saint Mary's lost surgery and other cases as a result of its anesthesia turnover in 2016, the majority of the business went to Spectrum Health.  One of the Spectrum hospitals is only 1.5 miles from the Mercy Health Saint Mary's campus, and therefore is convenient for Mercy Health Saint Mary's patients.  For these reasons, if patients are diverted from Mercy Health Saint Mary's due to A4's actions, these patients will most likely be treated at Spectrum Health.

89.    The inpatient surgical services market in Kent County is highly concentrated, with Spectrum's market share exceeding 60% and the HHI exceeding 4,600, almost double the level which is considered highly concentrated. Mercy Health Saint Mary's is the closest substitute to Spectrum, and one of only

two significant competitors. If Defendants' actions caused as few as 15% of Mercy Health Saint Mary's commercially insured surgery cases to shift to Spectrum, concentration would increase by more than 200 points, a level at which anticompetitive effect is presumed. THM's past experience involving the transition of anesthesia groups at Mercy Health Saint Mary's, as described above, makes such a shift, or greater, highly likely.

90.    The cardiac procedures market in Kent County is highly concentrated, with Spectrum's market share exceeding 65% and the HHI exceeding 5,000. As with surgery, Mercy Health Saint Mary's is one of only two significant competitors to Spectrum. If Defendants' actions caused as few as 25% of Mercy Health Saint Mary's commercially insured cardiac procedures to shift to Spectrum, concentration would increase by more than 200 points, a level at which anticompetitive effect is presumed. THM's past experience involving the transition of anesthesia groups at Mercy Health Saint Mary's, as described above, makes such a shift, or greater, highly likely.

91.    The obstetrical delivery services market in Kent County is highly concentrated, with Spectrum's market share exceeding 65% and the HHI exceeding 5,000. Mercy Health Saint Mary's is the closest substitute to Spectrum Health in Kent County, and one of only two significant competitors. If Defendants' actions caused as few as 15% of Mercy Health Saint Mary's

commercially insured deliveries to shift to Spectrum, concentration would increase by more than 200 points, a level at which anticompetitive effect is presumed. Again, THM's past experience involving the transition of anesthesia groups at Mercy Health Saint Mary's, as described above, makes such a shift, or greater, highly likely.

92.    Enforcement of the non-competes will also harm competition because it will require patients to forego the choice of Mercy Health Saint Mary's, despite its extremely high quality services.  Given that fact, and because Mercy Health Saint Mary's is one of only two significant competitors of the dominant hospital in the relevant markets, diversion of cases away from Mercy Health Saint Mary's would depress quality competition, and further reduce overall competition.

## Competitive Effects in Oakland County

93.    The inpatient surgical services market in Oakland County is highly concentrated, with the two largest systems' combined market share exceeding 70% and the HHI exceeding 3,700.  As explained below, Defendants' actions would cause the bulk of Saint Joseph Mercy Oakland's inpatient surgery cases to likely shift to these two systems.  If as few as a third of Saint Joseph Mercy Oakland's surgical cases shifted to those systems, the increase would exceed 200, which is presumptively anticompetitive.

31357492.32

94.     The cardiac procedures market in Oakland County is highly concentrated, with the largest two hospital systems' combined market share exceeding 75% and the HHI exceeding 3,500.  If as few as 25% of Saint Joseph Mercy Oakland's cardiac procedures shifted to those systems, the increase would exceed 200, which is presumptively anticompetitive.

95.     The obstetrical delivery services market in Oakland County is highly concentrated, with the two systems' combined market share over 80% and the HHI exceeding 4,000.  If as few as one half of Saint Joseph Mercy Oakland's deliveries shifted to those systems, the increase would exceed 200, which is presumptively anticompetitive.

96.     Such a shift is highly likely in the event that A4's actions are not enjoined.  Many surgeons and other physicians practicing at Saint Joseph Mercy Oakland also perform procedures at the other hospitals in Oakland County.  The second choice to Saint Joseph Mercy Oakland for the physicians on its active medical staff in each of surgical services, deliveries and cardiac procedures is either Beaumont Health or Ascension Health, the two systems with the greatest market share in the county, and the other one of these systems is generally the third choice.  These physicians perform more than half their surgeries and 40% of their cardiac procedures at hospitals other than Saint Joseph Mercy Oakland.  More than two-thirds of the surgeons with active staff privileges at Saint Joseph Mercy

Oakland also have privileges at one or both of these larger systems' hospitals. These physicians are therefore very likely to shift substantial numbers of cases away from Saint Joseph Mercy Oakland, and to these systems, if A4's non-competes constrain the employment of its anesthesiologists by Plaintiffs.

97.     Saint Joseph Mercy Oakland is one of the three leading hospital systems (along with Beaumont and Ascension) in zip codes representing 60% of the patients in its service area.  This is a further indication that Saint Joseph Mercy Oakland is an extremely close substitute for the hospitals operated by the two largest systems in Oakland County.  Any significant diversion of cases from Saint Joseph Mercy Oakland will also significantly harm competition because it will weaken this important competitive constraint on the largest hospital systems with the greatest market share in the relevant Oakland County markets.

98.     Enforcement of the non-competes will also harm competition, because it will require patients to forego the choice of Saint Joseph Mercy Oakland, despite its extremely high quality services in surgery, cardiology procedures, and obstetrical deliveries described above, all of which make it a very significant competitor in the relevant markets.  Diversion of cases away from Saint Joseph Mercy Oakland would deprive patients of the opportunity to benefit from these high quality services, depress quality competition, and further reduce overall competition.

99.    The concentration levels for the outpatient surgical services market in each of the relevant geographic markets is very similar to the concentration levels described above for the inpatient surgical services markets.  In each of the relevant geographic markets, the same surgeons generally perform surgeries in both inpatient and outpatient settings.

<u>**Significance of Changes in Concentration**</u>

100.   The diversion of surgical, cardiac, and obstetrical delivery cases from the THM hospitals in Kent and Oakland counties to the dominant hospitals in each county are very likely to have adverse effects on patients and overall competition. Economic research overwhelmingly shows that greater market concentration substantially increases hospital prices.  Relevant studies have concluded that when hospital markets become highly concentrated, with few competitors and high market shares, prices generally increase.

a.    A 2011 study examined the effect of hospital market concentration on specific procedures. It found that in concentrated hospital markets, hospitals charged 29% more for cervical fusion, 31% more for lumbar fusion, 45% more for total knee replacement, 49% more for total hip replacement, 50% more for angioplasty, and 56% more for CRM device insertion.  James C. Robinson, *Hospital Market Concentration,*

*Pricing, Profitability in Orthopedic Surgery and Interventional Cardiology,* 117(6) THE AM. J. OF MANAGED CARE e241, e244 (2011).

b.   One study from 2009 looked at the effect of hospital mergers and consolidations (and the resulting increase in market concentration) on the prices charged by nearby "rival" non-merging hospitals across the United States from 1989 to 1996. It found that non-merging hospitals increased prices 40 percent in response to hospital mergers.  Leemore Dafny, *Estimation and Identification of Merger Effects: An Application to Hospital Mergers,* 52 J. L. & Econ. 523, 544 (2009).

c.   Health Affairs published a 2005 study looking at the effect of hospital consolidation through system acquisition (i.e. a hospital joining a wider hospital system).  It found that "managed care prices were higher in system hospitals than in nonsystem hospitals by an average of $103 per day."   Alison Evans Cuellar and Paul J. Gertler, *How the Expansion of Hospital Systems has Affected Consumers,* 24(1) HEALTH AFFAIRS 213, 217 (Jan. 2005).

42

d.   A 2011 study examined the effect of concentrated hospital markets on hospital prices in 2001 and 2004. It concluded that "hospital prices are higher in more concentrated markets" and that a "1,000-percentage-point increase in the Shreveport hospital concentration index raises prices by approximately 8.3 percent." Glenn A. Melnic, Yu-Chu Shen and Vivian Yaling Wu, *The Increased Concentration of Health Plan Markets Can Benefit Consumers through Lower Hospital Prices,* 30(9) Health Affairs 1728, 1729-31 (2011).

e.   Another study of hospital mergers found that "[i]ncreases in hospital market concentration lead to increases in the price of hospital care." Martin Gaynor and Robert Town, The Impact of Hospital Consolidation—*Update,* Robert Wood Johnson Foundation, THE SYNTHESIS PROJECT (June 2012) at 1.

f.   A 2018 study found prices at monopoly hospitals are 12 percent higher than prices in markets with four or more competitors. Zack Cooper, Stuart V. Craig, Martin Gaynor and John Van Reenen, *The Price Ain't Right?  Hospital Prices and Health Spending on the Privately Insured*, The Quarterly Journal of Economics, vol. 134(1), pages 51-107 (Feb. 2019).

43

101.   There also are substantial barriers to entry which prevent any timely entry or expansion into the relevant markets, including, but not limited to, the need for specialized equipment, construction of operating rooms, and specialized medical staff.  Other entry or expansion barriers include regulatory delays (e.g., the certificate of need ("CON") process), lengthy construction costs, and development costs.   For example, Henry Ford West Bloomfield in Oakland County cost approximately $360 million to build and Saint John Providence Park (now called Ascension Providence Hospital, Novi Campus) in Oakland County cost approximately $360 million to build.  CONs are also required for entry involving certain outpatient procedures and outpatient ambulatory surgery centers.

### Defendants' Non-Compete Agreements Do Not Provide Any Procompetitive Benefits and Do Not Serve a Reasonable Business Interest

102.   Defendants' non-compete agreements with A4's anesthesiologists do not serve any reasonable business interest.  They do not serve to protect any confidential information possessed by A4's anesthesiologists, since none of the information possessed by A4's anesthesiologist is at all confidential to A4.  A4 has not taken any steps to keep any of the information it utilizes confidential, nor has it asked the THM employees with whom it works to keep any information confidential.  Moreover, A4 has not claimed to Plaintiffs' personnel that any of its information is confidential.

103.   Nor does A4 possess any unique customer information or goodwill. The patients the anesthesiologists see are provided by the hospital.  A4 does not advertise its physicians' services, nor does it keep any confidential patient lists or have any patients of its own.

104.   While A4 anesthesiologists have introduced techniques, such as certain kinds of nerve blocks, to the THM hospitals for the first time, these techniques are widely practiced in other areas.  A4 does not utilize any unique or proprietary processes, services, or techniques.   Notably, after A4 began its relationship with Plaintiffs at Saint Joseph Mercy Oakland, none of the processes used at the hospital changed.

105.   Defendants'   non-compete   agreements,   if   utilized   to   prevent employment of A4 anesthesiologists by Plaintiffs, also would not protect against any unfair competition.  Plaintiffs are customers, not competitors of A4.  Plaintiffs are simply attempting to continue the provision of anesthesiology services at their hospitals, in some cases utilizing the very same physicians who have provided services at the THM hospitals for a number of years before A4 employed them. For example, most of the A4 anesthesiologists working at Saint Joseph Mercy Oakland also worked at that hospital prior to their employment with A4. Therefore, their relationships with the hospital are completely independent of any relationship with A4.  Plaintiffs are not seeking to employ A4's anesthesiologists

in order to obtain any goodwill or customer information; they seek to utilize these physicians solely as employees, who will provide anesthesia services and who will assist in the organization and further development of these services.

106. Defendants' non-competes are not tailored to encompass only its reasonable competitive business interests with respect to the work the anesthesiologists performed at A4. Defendants are not enforcing the non-compete agreements to prevent their anesthesiologists from joining a competitor; the non-competes are being used in order to extract higher reimbursement rates from commercial payors by leveraging the importance of THM hospitals in the network for these payors. The result is to effectively hold Plaintiffs hostage by preventing them from effectively staffing the THM hospitals if they proceed with termination based on A4's very serious breaches of its contractual obligations. Use of a relationship with the THM hospitals in order to extract greater rates falls far outside the ambit of "reasonable business interests" that a reasonable non-compete clause should be tailored to protect.

107. There are no procompetitive justifications for Defendants' actions. Even assuming, *arguendo*, and contrary to the allegations above, that the non-competes provide some benefits to Defendants, they do not provide any benefits in the relevant markets, do not create any procompetitive effects in the relevant

markets, and do not offset the significant anticompetitive effects in the relevant markets.

## COUNT I
## UNLAWFUL AGREEMENT IN VIOLATION OF
## SHERMAN ACT § 1 – KENT COUNTY

108.   Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 107 above, as if fully restated herein.

109.   Each of the non-compete agreements between Defendants and their anesthesiologists is a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

110.   The non-compete clauses threaten to have substantial and unreasonable anticompetitive effects in each of the relevant service markets in Kent County as set forth above.

111.   The non-compete agreements therefore threaten to unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

112.   As a direct and proximate result of Defendants' threatened violations of Section 1 of the Sherman Act and the anticompetitive effects thereof, Plaintiffs will suffer irreparable harm and damages to their business and property.

113.   These violations, and the anticompetitive effects and irreparable harm caused thereby, will continue unless enjoined.

114.   Defendants are liable for all damages resulting from lost patients due to inadequate anesthesia coverage resulting from Defendants' insistence on enforcement of the non-competes.

## COUNT II
## UNLAWFUL AGREEMENT IN VIOLATION OF
## SHERMAN ACT § 1 – OAKLAND COUNTY

115.   Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 107 above, as if fully restated herein.

116.   Each of the non-compete agreements between Defendants and their anesthesiologists is a contract, combination, and conspiracy within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

117.   The non-compete clauses threaten to have substantial and unreasonable anticompetitive effects in each of the relevant service markets in Oakland County as set forth above.

118.   The non-compete agreements therefore threaten to unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

119.   As a direct and proximate result of Defendants' threatened violations of Section 1 of the Sherman Act and the anticompetitive effects thereof, Plaintiffs will suffer irreparable harm and damages to their business and property.

120.   These violations, and the anticompetitive effects and irreparable harm caused thereby, will continue unless enjoined.

31357492.32

121.   Defendants are liable for all damages resulting from lost patients due to inadequate anesthesia coverage resulting from Defendants' insistence on enforcement of the non-competes.

## COUNT III
## VIOLATION OF STATE ANTITRUST LAWS

122.   Plaintiffs restate and reallege the allegations contained in Paragraphs 1 through 121 above, as if fully restated herein.

123.   Defendants' non-compete clauses violate MCL 445.772.

## COUNT IV
## BREACH OF CONTRACT – NON-PARTICIPATION
## IN PAYOR NETWORKS

124.   Plaintiffs restate and reallege the allegations contained in Paragraphs 1 through 107 above, as if fully restated herein.

125.   By ending its participation in contracts with BCBSM and Priority, A4 has breached the provisions of the ASA and MSA that require it to participate in such contracts.   These breaches are material, since they jeopardize potentially hundreds of millions of dollars in revenues from these commercial payors at the affected hospitals.

126.   A4 is liable in damages for all lost business due to its breaches of contract.

127.   These violations, and the anticompetitive effects and irreparable harm caused thereby, will continue unless enjoined.

31357492.32

## COUNT V
## BREACH OF CONTRACT – FAILURE TO RELEASE PHYSICIANS FROM PROVISIONS OF NON-COMPETES

128.   Plaintiffs restate and reallege the allegations contained in Paragraphs 1 through 107 above, as if fully restated herein.

129.   A4 is required on termination of its agreements and/or orders with Plaintiffs to release its physicians from their non-compete agreements to allow them to be employed by Plaintiffs.  These agreements also provide that Plaintiffs may employ A4's physicians after termination.

130.   Plaintiffs have sought to reach agreement regarding employment with A4 physicians, to be effective on termination, but A4 has refused to release these physicians from their non-competes.

131.   A4 is therefore in breach of its agreements with Plaintiffs.

132.   Defendants are liable for all damages resulting from lost patients due to inadequate anesthesia coverage resulting from Defendants' insistence on enforcement of the non-competes.

133.   These violations, and the anticompetitive effects and irreparable harm caused thereby, will continue unless enjoined.

## COUNT VI
## DECLARATORY JUDGMENT AND REQUEST FOR INJUNCTIVE RELIEF WITH RESPECT TO NON-COMPETES

31357492.32

134.   Plaintiffs repeat and reallege the allegations of Paragraphs 1 through 107 above, as if fully restated herein.

135.   In order to prove that a non-compete covenant is enforceable under Michigan law, Defendants must show: (i) the clause prevents unfair competition; (ii) the clause is otherwise reasonable; (iii) the clause protects the plaintiff's confidential information or goodwill; and (iv) the clause is tailored to the situation. A4's non-compete agreements do not meet any of these requirements.

136.   None of these requirements is met with regard to Defendants' non-competes with their anesthesiologists if utilized to bar employment by Plaintiffs.

137.   These violations, and the anticompetitive effects and irreparable harm caused thereby, will continue unless enjoined.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

    a.    Require that Defendants release their physician employees practicing at THM hospitals from any restrictions on their employment by Plaintiffs;

    b.    Issue a declaratory judgment finding that Defendants' non-competition clauses in their agreements with their physicians violate federal and Michigan antitrust laws to the extent that

they are utilized to prevent A4 anesthesiologists from becoming employed by Plaintiffs;

c.    Issue a declaratory judgment that Defendants' non-competition clauses in their agreements with their physicians violate MCLA 445.774a if applied to employment by Plaintiffs;

d.    Preliminarily and permanently enjoin Defendants from enforcing the non-competition clauses in their agreements with the A4 anesthesiologists against Plaintiffs;

e.    Grant Plaintiffs three times their damages suffered as a result of any effort by Defendants to enforce or insist upon compliance with the non-compete clauses;

f.    Grant Plaintiffs their damages suffered due to A4's breaches of contract described above;

g.    Award Plaintiffs their taxable costs and reasonable attorneys' fees; and

h.    Grant such other relief as this Court finds just.

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs hereby demand a trial by jury on all issues so triable.

s/David A. Ettinger
_____
David A. Ettinger (P26537)
Jennifer Schwab (admitted E.D. Mich.,
Illinois Bar No. 6329345)
Honigman LLP
2290 First National Building
660 Woodward Avenue
Detroit, MI 48226
(313) 465-7368 (p)
(313) 465-7369 (f)
dettinger@honigman.com

Dated: July 23, 2019

31357492.32